FILED

2015 Mar-18  PM 03:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

TRACY STEVENS,                          )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )        Case No.  1:12-cv-3782-TMP
                                        )
STATE OF ALABAMA                        )
DEPARTMENT OF                           )
CORRECTIONS, *et al.*,                  )
                                        )
            Defendants.                 )


## <u>MEMORANDUM OPINION</u>

This cause is before the court on the motion for summary judgment filed May 22, 2014, by the defendants, the Alabama Department of Corrections, Kim Thomas, Robert Danford, Bradrick Files, Grantt Culliver,[1] and James DeLoach. (Doc. 26).  The motion was supported by a brief (filed one day out of time, after seeking and receiving an extension of time) and an evidentiary submission.[2] (Docs. 26, 28).   After seeking and receiving an extension of time in which to respond, the plaintiff filed an opposition to the motion, supported by evidence, on

---

[1]  The name was misspelled in the complaint as Grant Culiver.  The Clerk is DIRECTED to correct the style of the case to reflect the correct spelling.

[2]   The parties consented to the dispositive jurisdiction of the undersigned magistrate judge on March 8, 2013.  (Doc. 12)

July 16, 2014.  (Docs. 33, 34).  The defendants filed a brief in reply on August 4, 2014.   (Doc. 37).   The defendants further filed a motion to substitute the declaration of Danford for the previously filed, unsigned declaration.  (Doc. 37).[3]

Plaintiff, Tracy Stevens, a female corrections officer, alleges that her employer, the Alabama Department of Corrections ("ADOC"), discriminated against her on the basis of her gender.  (Count One).  She further asserts that after she complained of gender discrimination, ADOC retaliated against her.  (Count Two).  She also seeks redress for sex discrimination (denial of equal protection) pursuant to 42 U.S.C. § 1983 (Count Three), asserts that defendant Files invaded her privacy in violation of Alabama state law (Count Four), and alleges that defendant Thomas acted with deliberate indifference by failing to stop gender discrimination against the plaintiff (Count Five).[4]

## I.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and

---

[3] The motion was docketed as a reply, but is actually a motion and hereby is GRANTED.

[4] All of the individuals are sued in both their official and individual capacities.   The claims raised and discussed herein as Title VII employment claims, however, are properly brought against only the employer, ADOC.   See Busby v. City of Orlando, 931 F.2d 764 (11th Cir. 1991).

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Celotex, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." Id. at 323.

Once the moving party has met her burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting former Fed. R. Civ. P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry

of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The evidence supporting a claim must be "substantial," Marcus v. St. Paul Fire

4

and Marine Ins. Co., 651 F.2d 379 (5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a genuine issue of fact.  Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-1250 (11th Cir. 2004).  If the non-movant's evidence is so thoroughly discredited by the rest of the record evidence that no *reasonable* jury could accept it, the evidence fails to establish the existence of a genuine issue of fact requiring a jury determination.  See Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have reviewed the facts in the light depicted by the videotape."); Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1290 n. 3 (11th Cir.  2009).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function

of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.  FACTS

Applying the above-referenced standards to the evidence in the record, the following facts appear to be undisputed, or, if disputed, are viewed in the light most favorable to the non-moving plaintiff.

Tracy Stevens is a female employee of the Alabama Department of Corrections, where she worked at all times relevant to this action as a corrections officer at the Childersburg Work Release Center ("CWRC") in Talladega County.[5] At relevant times, Kim Thomas was the Commissioner of ADOC; Robert Danford was the warden of CWRC; Bradrick Files was a lieutenant and shift supervisor at CWRC; Grantt Culliver was the Facilities Coordinator for ADOC, and James DeLoach was Associate Commissioner of Operations at ADOC.  All of the individual defendants are male.  (Complaint, Doc. 1, ¶¶ 5-11).

---

[5] At the time the motion was briefed, the plaintiff remained employed in the same position at the same facility.

Stevens was hired as a corrections officer in December 1994. She was assigned to the CWRC. Files, a lieutenant, worked as a shift supervisor. She began working the same shift as Files in 2001 or 2002. Files kissed her once on the lips in 2001 or 2002, but she did not report the kiss to anyone at ADOC, and has testified that she does not consider that kiss to be part of this lawsuit. (Stevens depo., Doc. 34-1, pp. 5-8).[6] Stevens testified that Files treated her fairly and professionally. Id. During the first three years that Stevens was supervised by Files on the third shift, she had "no problems" with Files. (Depo. of Stevens, Doc. 26-1, p. 11). In 2011, both Stevens and DeWarren Baldwin were corrections officers working together on the third shift, and both were supervised by Files.

On February 3, 2011, Files had a conversation with Baldwin in the dining hall of the CWRC. (Doc. 1, ¶12). Files told Baldwin that Stevens "hated men because of what her husband did to her in the past," and said her husband had "dogged her out." (Depo. of Baldwin, Doc. 2-2, p. 43). Files told Baldwin that "you could tell" Stevens didn't like men by "the way she … treated the inmates." Id. at 44. Baldwin says that Files also referred to Stevens as a "dyke." Id. at 49.

---

[6] Plaintiff discusses the kiss at some length in the 89-page brief filed in response to the motion, but the kiss is simply irrelevant to this action because it occurred a dozen years before the act complained of, and because plaintiff never complained of it to Files, to any ADOC official, to the EEOC, or even to any co-worker. It appears that the kiss occurred just after the plaintiff gave defendant Files a Christmas gift.

Later during the same shift, Baldwin told Stevens about the conversation he had with Files.  He told her that Files warned him to be careful who he learned how to do his duties from.  (Depo. of Stevens, Doc. 26-1, p. 92).  Baldwin also told Stevens that Files had said her husband "dogged her out," and that she didn't like men.  Baldwin did not tell Stevens that Files had called her a "dyke."

The next day, on February 4, 2011, Stevens filed a complaint with Captain Ronald Sellers.  (Complaint Form, Doc. 26-3).  Stevens reported that Baldwin told her that Files said she "does not like men."  She complained that his statements violated ADOC's Administration Regulation 206, Section IIA, which prohibits "derogatory descriptions or stereotypes based on race, sex, color, national origin, age, sexual orientation, ancestry or where disability is concerned."  (Doc. 26-3).  She further reported that she had heard Files say: "Nobody eats cupcakes but kids and punks," and had heard Files call an inmate a "sissy."  Id.[7]  She characterized Files' statements as "rumor(s) and derogatory comments" that created a hostile work environment.  Id.  Stevens listed as the remedies she sought to have Files demoted and transferred to another correctional facility.  Id. at p. 4.

Immediately after Stevens filed the complaint, Captain Ronald Sellers conducted an investigation that consisted of submitting written questions to

---

[7] Stevens said she believes that the statements are offensive statements relating to homosexuals (Stevens Depo.,  Doc. 26-1, p. 149), although there is no direct evidence of Files' own meaning for the terms.

Baldwin, Files, and Stevens to which each submitted written answers.  Files also submitted a separate written statement dated February 8, 2011.  (Files Statement, Doc. 26-12).  In the statement, Files admitted that he told Baldwin that Stevens didn't like men.  Id.  Files explained that he made the statement "in an attempt to show Officer Baldwin that Officer Steven's [sic] didn't have his best interest in mind, and that she was in fact just using him."  Id.  He said he felt that Baldwin was not sufficiently independent and was going to be disciplined for actions, such as incorrect bed-roster counts, that were based on Stevens' mistakes or lack of diligence.  In deposition, Files admitted that he may have said Stevens' husband "dogged her out," and that he meant that "her and her husband didn't have a good ending to their marriage and he didn't treat her well."  (Files Depo., Doc. 26-6, p. 14).  He further stated that he believes what he said was not discriminatory or harassing, but that it was inappropriate and unprofessional, and that he has apologized to Stevens.  Id. at p. 27-28.[8]

The statement Baldwin gave as part of the investigation recounted that Files said Stevens didn't like men and that her husband had "dogged her out," but it did not report that Files used the word "dyke."  (Baldwin Decl., Doc. 26-4, p. 3).  He stated that Files made the statement when he was talking about "how the shift should be run" and that he should "be careful about what officer [he] learned

---

[8] Files disputes that he ever called Stevens a "dyke," but for purposes of this motion, the allegation is accepted as true.

from." (Baldwin Questionnaire, Doc. 26-11, p. 2). Baldwin stated that he never heard Files say anything disparaging about Stevens on any other occasion, and never saw him "mistreat Officer Stevens in any other way." (Baldwin Decl., Doc. 26-4, p. 3). He referred to the conversation with Files about Stevens as a "one-time event." Id.

As a result of the investigation, Sellers concluded that Files had stated that Stevens "does not like men because when she was married her husband dogged her out." He further noted that the statement "does not definitively reference sexual orientation." (Decision, Doc. 26-5, p. 2). Sellers did, however, conclude that the statements "were inappropriate and possibly contrary to" ADOC regulations, and that "although inappropriate," the remarks "were not designed as an attack" against Stevens, but as an effort to inspire Baldwin to improve his job performance. Id. Sellers further stated that "transfer to another institution is an option" for Stevens, and that "the potential for a hostile working environment existed prior to [Stevens] bringing the matter to [the EEO officer's] attention." Id. He further concluded that "no residual repercussions are reasonably foreseeable." Id.

After the investigation was concluded, Files was given a written warning, which remains in his permanent personnel file, and Files and Stevens were assigned to work on different shifts for some period of time. Stevens' request that Files be "involuntarily demoted" and transferred to another facility was denied.

Stevens appealed, and the decision was affirmed by the ADOC Equal Opportunity Officer, Kimberly Weary.  (Thomas Decl., Doc. 26-10,  p. 3).

On February 10, 2011, while the investigation was ongoing, plaintiff contacted DeLoach,[9] and told him that Files had referred to her by a "derogatory term" that is used in reference to lesbians.  (DeLoach Depo., Doc. 34-1, p. 62). DeLoach responded that "no one cares about anyone's sexuality anyway." (Stevens Affi., Doc. 34-1, p. 96).    DeLoach contacted Culliver about the complaint, and Culliver "talked to the warden who looked into this incident." (Culliver Depo., Doc. 34-1, p. 107).  No further investigation was conducted by DeLoach or Culliver.   Stevens does not know of any other witnesses who should have been interviewed about her complaint but were not.  (Stevens Depo., Doc. 34-1, p. 14).   She has stated that she has no evidence that any mistreatment she complains of was because she was female, as opposed to because she was alleged to be homosexual.  (Doc. 26-1, p. 88).

After the investigation concluded and Files was given a written discipline, Stevens testified that she and Files continued to work on the same shift until

---

[9]   According to DeLoach's deposition, which is the evidence referred to by plaintiff, the contact came sometime in 2010, which would have been a year before the alleged incident.  (Doc. 34-1, p. 62).  In the context of the other evidence, however, it appears that plaintiff called DeLoach in 2011, after the statement made the basis of this action.  Plaintiff provides that as the date in her brief, and states that date in her affidavit (doc. 34-1, p. 96), but it appears to be disputed by DeLoach's testimony, also provided by plaintiff.

June 2011.  Stevens requested a shift change from the warden, and it was granted.
(Doc. 34-1, pp. 13-14).[10]    Stevens does not allege that any other harassing
statements were made to her by Files or any other defendant after the investigation
concluded.  On one occasion, Files called Stevens "sir," but he corrected himself
and said he didn't want to be called to the warden's office.  (Stevens Depo., Doc.
34-1, p. 32).

Baldwin has stated that, after the February incident, the working
environment changed and that Files became "strictly business."  (Baldwin Depo.,
Doc. 34-1 p. 82).  After that incident, Baldwin said he "came in and did [his] job to
the best of [his] ability" in order to avoid giving Files a reason to write him up or
send him to the warden's office.  (Id.)

Stevens complains that she was retaliated against after she reported Files'
statement in 2011.  She asserts that the retaliation was that she was disciplined
unfairly and not given proper respect.  Specifically, she says that in May 2011, a
male inmate masturbated in front of another officer, and although Stevens did not
witness the incident, she became aware of it.  She told her supervisor, Sgt.
Caldwell, but she did not write the infraction in the incident report book until the

---

[10]  The accounts given of the shift changes and work situations of Files and
Stevens after the investigation are muddled, at best, in both the briefs and in the
depositions.  It is undisputed, however, that there was some period of time after
which both continued to work the same shift at CWRC, and there was some period
of time in which they worked different shifts at CWRC, and that eventually in
2013 Files was transferred to another ADOC facility after he received a promotion.

next day.  She was initially given a two-day suspension without pay for failure to make a timely report of a serious inmate violation, but the punishment was reduced to a written reprimand by Commissioner Thomas after a hearing.  Caldwell also was disciplined after the incident.  (Sellers Decl., Doc. 26-9, p. 4).  Stevens maintains that she was following Caldwell's instructions and should not have been given the written reprimand, but she does not deny that she failed to prepare a written report the incident during the shift on which it occurred.

In the winter of 2012, Stevens won an award as "Top Gun of the Class." This award was not printed in the ADOC newsletter, although the winner of the "Top Gun of the Year" had been previously recognized in the newsletter.

In January of 2012, an inmate was charged with insubordination after he called Stevens a "dyke bulldag [sic] bitch," in a conversation with another corrections officer.  The inmate was found guilty, but Captain Sellers disapproved the punishment prescribed for the inmate, after determining that the corrections officers who heard the statement may have provoked the inmate.  (Sellers Decl., doc. 26-9, pp. 5-6).

Stevens further asserts that she was retaliated against by receiving a counseling session from Files after a prisoner miscount, although two officers who miscounted inmates the day before had not received a counseling session.  She admits however, that she sometimes had miscounts for which she did not receive a

counseling session (the least severe disciplinary action available).   (Doc. 34-1, p. 30.)   The miscount Stevens was disciplined for was a formal count, but the one the day before was not a formal count.   A counseling session is not recorded in the officer's permanent personnel file.

Baldwin spoke with Culliver about his impressions that he was being "picked on" after he told Stevens about Files' statements, and Culliver told Baldwin that he needed to "stay away" from Stevens because "she seems like she's trouble."   (Baldwin Depo., Doc. 34-1, p 79).

Stevens sought a transfer to another ADOC facility on October 2, 2012, but her request was denied, even though a male officer had been granted a transfer in September of 2012.   ADOC's policy was to allow transfers only when another officer was willing to "change places" with the transferring officer.   The male officer whose transfer was approved had sought the transfer months in advance and had demonstrated "exceptional circumstances."[11]   Danford did attempt to arrange for Stevens to be transferred to Birmingham Work Release, but was unable to find an officer at the Birmingham Facility who would agree to the change.   Danford was able to arrange for Stevens to be transferred to the St. Clair Correctional

---

[11]   The warden explained that the male officer was getting married to a woman who lived in Huntsville, which would require several hours of commuting each day, and that he believed that the officer would quit if he was not allowed to transfer.

Facility, which is located nearer to Stevens' home, but Stevens declined the offer. (Danford Decl., Doc. 26-8; Sellers Decl., Doc. 26-9).

# III.  DISCUSSION

Plaintiff alleges that the defendants discriminated against her and retaliated against her after she complained about the statements Files made to Baldwin.  The defendants' motion for summary judgment seeks summary dismissal of plaintiff's claims.  Defendants contend that plaintiff's Title VII discrimination claim is due to be dismissed because: (1) the conduct complained of was not violative of Title VII; (2) the plaintiff suffered no adverse job impact; (3) the conduct was not severe or pervasive; (4) the defendants took reasonable action to stop the conduct complained of; and (5) Files was not the plaintiff's supervisor under Title VII.  The defendants further seek summary judgment in their favor on the Title VII retaliation claims based upon the failure to show that the alleged retaliatory acts were sufficiently adverse, or that retaliation was the but-for cause of the actions.

Plaintiff further alleges that she is entitled to relief for the same discrimination and retaliation pursuant to Sections 1981 and 1983.  Defendants seek dismissal of those claims on the basis that her allegations do not constitute a violation of the constitution that can be remedied through Sections 1981 or 1983.

Plaintiff also sets forth a state-law claim for invasion of privacy, which defendants

assert has not been substantiated by any evidence.


## A.  TITLE VII DISCRIMINATION CLAIMS

Title VII prohibits discrimination with respect to an employee's

"compensation, terms, conditions, or privileges of employment because of such

individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).

Specifically, the statute provides that it shall be unlawful for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to
> discriminate against any individual with respect to his compensation,
> terms, conditions or privileges of employment, because of such
> individual's race, color, religion, sex, or national origin.

2 U.S.C. § 2000e-2(a)(1).  Noticeably absent from the statute is any protection

against discrimination on account of sexual orientation.  The Eleventh Circuit

Court of Appeals has held that same-sex harassment, such as a homosexual

supervisor's advances upon a same-sex employee, can be actionable under Title

VII, but specifically noted:  "We do not hold that discrimination because of sexual

orientation is actionable."  Fredette v. BVP Mgmt. Assocs., 112 F.3d 1503, 1510

(11th Cir. 1997).   Other circuit courts of appeal have similarly recognized that

sexual orientation is not a protected class under Title VII.  See Vicker v. Fairfield

Med. Ctr., 453 F.3d 757, 762 (6th Cir. 2006); Medina v. Income Support Div., 413

F.3d 1131, 1135 (10th Cir. 2005);   Rene v. MGM Grand Hotel, Inc., 305 F.3d 1061, 1063 (9th Cir. 2002)(*en banc*);   Bibby v. Philadelphia Coca Cola Bottling Co., 260 F.3d 257, 265 (3d Cir. 2001);   Simonton v. Runyon, 232 F.3d 33, 35 (2d Cir. 2000);   Hamner v. St. Vincent Hosp. and Health Care Ctr., Inc., 224 F.3d 701, 707 (7th Cir. 2000);   Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 259 (1st Cir. 1999).   Courts within the Eleventh Circuit have consistently rejected Title VII claims where the complaints were based upon discrimination that arose from the plaintiff's sexual orientation or perceived sexual orientation.   See, e.g., Bostick v. CBOCS, Inc., 2014 WL 3809169 (M.D. Fla. Aug. 1, 2014);   Valencia v. Department of Interior, 2008 WL 4495694 *13 (M.D. Ala. Oct. 7, 2008);   Hudson v. Norfolk So. Ry. Co., 209 F. Supp. 2d 1301, 1315 (N.D. Ga. 2001); Fitzpatrick v. Winn-Dixie Montgomery, Inc., 153 F. Supp. 2d 1303, 1306 (M.D. Ala. 2001).   In sum, there is no support for plaintiff's claim that Title VII gives rise to protection for discrimination based upon a supervisor's perception that she is a lesbian.   The only actions she complains are discriminatory (as opposed to retaliatory) are that Files told Baldwin that she "hated men," was "dogged out" by her former husband, and was a "dyke."   On face value, and when viewed in the context in which the comments were made, they disparage plaintiff's perceived sexual orientation, and not her gender.   When asked at deposition whether she had any evidence that she was mistreated because she was female, as opposed to an alleged homosexual, she

answered that she did not.  (Stevens Depo., Doc. 26-1, p. 88).  Accordingly, the defendant is entitled to summary adjudication of plaintiff's Title VII claim of gender discrimination, and Count One is due to be dismissed.

The Title VII discrimination claim also is due to be dismissed because, even if the conduct complained of could be construed as gender or sex discrimination, it was neither so severe nor so pervasive as to meet the governing standards.  To sustain a claim of a hostile environment, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).  The court must examine "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc).

Stevens does not allege that her conditions of employment were altered, except to say that she and Files did not converse after that except as necessary for work and in a professional manner.  None of the conduct alleged was physically threatening.  Even if the conduct was gender-based (and this court finds it was not), it was more analogous to the occasional racial slur or ethnic epithet which

have been the basis of many race or national origin complaints ultimately found insufficient to withstand summary judgment.   See, *e.g.*,   E.E.O.C. v. Beverage Canners, Inc., 897 F.2d 1067, 1068 (11th Cir. 1990) (holding that for racial slurs to constitute a hostile environment, they must be "commonplace, overt and denigrating" such that they create "an atmosphere charged with racial hostility"); Van Portfliet v. H & R Block Mortgage Corp., 290 Fed. App'x 301, 304 (11th Cir. 2008).   It has been noted that Title VII may not be used as a tool to punish "the ordinary tribulations of the workplace," Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 2284 (1998), or failure to treat an employee with "sensitivity, tact and delicacy," Minor v. Ivy Tech State College, 174 F.3d 855, 858 (7th Cir. 1999).   Stevens' discrimination complaint rests on a "mere offensive utterance," that was not gender-based, and that was not repeated.   Her conditions of employment were not altered, and the work environment remained essentially the same.   As the comment by Files was a "one time thing," it was not a frequent occurrence.[12]   In sum, plaintiff cannot show that the alleged harassment by Files was sufficiently severe or pervasive to support a claim under of hostile work environment under Title VII.

---

[12]   The other comments allegedly made by Files were about "kids and punks" and "sissies," which -- even if derogatory to gay people -- were occasional and not directed toward Stevens.

Citing the unpublished case of <u>Lewis v. U.S. Dep't of Labor, Admin. Review Bd.</u>, 368 F. App'x 20 (11th Cir. 2010), the Department of Corrections[13] also argues that it is entitled to dismissal of plaintiff's Title VII hostile environment claim under the <u>Faragher</u> defense.  <u>See</u> <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998), and <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).  Under <u>Faragher</u>, an employer is not liable for a hostile work environment if the employer takes reasonable steps to prevent and correct harassing behavior and the employee unreasonably fails to take advantage of the employer's corrective procedures.  The defense is unavailable where the plaintiff has suffered a tangible adverse employment action, such as being fired, suspended, or demoted.[14]  In this case, however, the plaintiff did not suffer any tangible adverse employment action.  The

---

[13]   Of course, for purposes of a Title VII claim, the only proper defendant is the Alabama Department of Corrections (or the State of Alabama).  Actions under Title VII lie only against the plaintiff's "employer," not against co-employees or supervisors.  <u>See</u> <u>Busby v. City of Orlando</u>, 931 F.2d 764 (11th Cir. 1991).  Thus, insofar as plaintiff attempts to assert either a Title VII hostile-work-environment claim or a Title VII retaliation claim against Files, Sellers, Culliver, or Thomas, these defendants are due to be dismissed on that basis.

[14]   The defendants assert that Files should not be considered a supervisor under prevailing law.  It is true that for Title VII purposes a "supervisor" must be someone who has the ability to affect the terms and conditions of the plaintiff's employment, not merely someone who oversees the plaintiff's work.  For purposes of this motion, the court assumes, without deciding, that Files was plaintiff's supervisor.  There is evidence that Files conducted employment evaluations of the plaintiff, which suggests he could affect the terms and conditions of her employment.

Supreme Court has defined a tangible employment action as one involving, in most cases, "direct economic harm."  Ellerth, 524 U.S. at 762.  It further is undisputed that Stevens did not suffer any decrease in pay or loss of any economic opportunity. [15]

It is generally said that the Faragher/Ellerth defense requires the defendant employer to prove *both* elements: (1) that the employer took reasonable steps to prevent and correct harassing behavior, and (2) that the employee unreasonably failed to take advantage of the employer's corrective procedures.   See, e.g., Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d 1287, 1303 (11th Cir.2007) ("Because it is an affirmative defense, the employer bears the burden of establishing both of these elements."); Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1313 (11th Cir.2001); Speigner v. Shoal Creek Drummond Mine, 402 F. App'x 428, 431 (11th Cir. 2010).  The Eleventh Circuit has declined to decide whether the employer must prove both elements in "sudden sexual harassment" cases in which neither the employee nor the employer can reasonably anticipate the harassment, but to which both react reasonably by (for the employee) promptly

---

[15] One of plaintiff's complaints is that she did not receive recognition in the ADOC newsletter when she won a marksmanship award.  There is no evidence that any defendant had control over what was published in the newsletter, or that any defendant had knowledge of the award but failed to seek to have it included in the newsletter, or, for that matter, that the award for "Top Gun of the Class" was equivalent to the honor of "Top Gun of the Year."  Moreover, publication of the award amounted to no more than publicity; it did not result in any promotion or extra pay, or any other economic consequence.

reporting it and (for the employer) promptly correcting it.  See Walton v. Johnson & Johnson Services, Inc., 347 F.3d 1272, 1291 (11th Cir. 2003) (cataloguing the arguments for and against application of the defense when both plaintiff and employer act reasonably, but declining to "weigh in on this debate.").  It can be argued, however, that when the employee promptly reports harassment and the employer provides prompt and effective correction of the reported harassment, the defense should shield the employer because it has done everything it can both to prevent and correct illegal conduct by its subordinates.  Certainly, as between two reasonable parties put into conflict by the actions of another, it is understandable that some courts hold that the plaintiff should not be deprived of a remedy.  See Greene v. Dalton, 164 F.3d 671, 674-75 (D.C.Cir.1999).  On the other hand, if the employer takes objectively reasonable corrective steps, what remedy remains?  The harassing behavior has been promptly and effectively stopped by the employer.[16]

---

[16]   Indeed, it can be argued that not allowing the employer to claim the defense under such circumstances creates an incentive for employers not to set up preventative and correcting procedures, contrary to the policy of Title VII encouraging them to prevent workplace sexual harassment.  If the employer takes prompt and effective corrective steps to stop harassment, but remains liable anyway, the corrective steps do nothing more than constitute an admission by the employer that harassment has occurred, which is used against it in subsequent litigation.  On the other hand, if the employer simply fails to set up procedures by which employees can report harassment, the employer is exposed to no greater liability and it does not suffer the use of an admission against it.  Thus, the denial of the Faragher defense to an employer who takes prompt, good faith, and effective steps to stop and correct harassment tends to undermine the fundamental Title VII policy   of   encouraging   employers   to   provide   harassment-free   working

At bottom, the potential Title VII liability of the employer rests on its failure to take reasonable steps to prevent workplace harassment.  When it has fulfilled its duty under Title VII, it should not be liable for conduct it could not reasonably anticipate, which it tried to prevent, and which it disciplined promptly after it occurred.

Nonetheless, the law in this circuit seems clear that the employer must prove *both* prongs of the <u>Faragher</u> defense.  In the instant case, it is quite clear that plaintiff did not unreasonably fail to take advantage of the Department of Corrections' procedures for reporting harassment.  Plaintiff filed a complaint about Files' comments the day after they occurred.  The fact that the defendant conducted a prompt investigation and reprimanded Files mere days later, while proving the first prong of the defense, cannot establish the second prong.  In the absence of proof of both elements of the defense, it is unavailing to the defendant.

Although the Department of Corrections cannot prevail on the Faragher defense, for other additional reasons explained above, the defendants' motion for summary judgment on the Title VII discrimination claim is due to be granted.  All Title VII hostile work environment claims are due to be dismissed with prejudice.

---

environments.  Allowing the defense encourages employers to promptly and effectively correct harassing behavior when it is discovered, which is consistent with the fundamental goal of Title VII to end workplace discrimination and harassment.

## B.  RETALIATION CLAIMS

Defendant Department of Corrections also seeks summary adjudication of plaintiff's claim of retaliation in violation of Title VII.[17]  Defendant asserts that plaintiff is unable to offer evidence to meet the elements required to prove a *prima facie* case of Title VII retaliation.  Title VII's anti-retaliation provision states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter....

42 U.S.C. § 2000e-3(a).

In order to survive a properly supported motion for summary judgment, the plaintiff in a Title VII retaliation case must establish a *prima facie* case by showing: (1) that she engaged in protected conduct and (2) suffered an adverse employment action that was (3) causally connected to the protected expression. Bolivar v. University of Georgia Survey and Research, slip op. No. 3:11-CV-24, 2012 WL 4928893 *8 (M.D. Ga. Oct. 16, 2012); Taylor v. Runyon, 175 F.3d 861, 868 (11th Cir. 1999).

The plaintiff has the obligation to show a causal connection by showing "that the decision makers were aware of the protected activity and the protected

---

[17]    Again, the only proper defendant as to this claim is the Alabama Department of Corrections, as plaintiff's "employer."

activity and the adverse action were not wholly unrelated." <u>Bass v. Board of County Comm'rs., Orange County</u>, 256 F.3d 1095, 1119 (11th Cir. 2001) (overturned on other grounds).  The causal link requirement is to be construed broadly, and the Eleventh Circuit Court of Appeals has stated that "a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated." <u>Brungart v. Bellsouth Telecommunications, Inc.</u>, 231 F.3d 791, 799 (11th Cir. 2000) (quoting <u>Clover v. Total Sys. Servs., Inc.</u>, 176 F.3d 1346, 1354 (11th Cir. 1999)).  However, to meet even this low threshold of proof of causation, the plaintiff must offer some evidence from which a jury could infer that the protected activity caused the adverse employment action.

Not all actions that an employee does not like or did not want constitute "adverse employment actions," however.  The Supreme Court has noted that retaliation may be premised on an act that is less harsh than one that sustains a discrimination claim.  In <u>Burlington Northern and Santa Fe Railway. Co. v. White</u>, 548 U.S. 53, 126 S. Ct. 2405, 2412-13, 165 L. Ed. 2d 345 (2006), the Court noted that an actionable retaliatory act is not limited to one that "affects the terms and conditions of employment."   To constitute retaliation under Title VII, however, the actions must be "materially adverse."   126 S. Ct. at 2414.  A "materially adverse" action is one that a reasonable employee would have found substantial enough that it "might well" dissuade him or her from making or supporting a

charge of discrimination.  Id.  See also Crawford v. Carroll, 529 F.3d 961, 974 (11th Cir. 2008).

The plaintiff asserts that ADOC retaliated against her by disciplining her for a minor infraction that had not previously been enforced, for failing to properly punish an inmate who used derogatory terms to describe the Plaintiff in violation of the State of Alabama's code of conduct for inmates, and by refusing to allow her to transfer to another institution.  (Complaint, Doc. 1, ¶ 44).  The facts, however, demonstrate that the discipline she complained of – improper counting – was punished with only a verbal counseling, the least severe discipline available.  She does not dispute that she was guilty of improper counting.  The discipline she received for failing to report the inmate's conduct – a suspension – was reduced by one of the defendants to a written reprimand.  Again, she does not dispute that she did not report the conduct during the shift in which it occurred, which was against ADOC policy.  And while Stevens was not allowed to transfer immediately, ADOC's ultimate offer to allow her to transfer was refused. While the court must view the "totality of the alleged reprisals," the court need only consider "those that are truly adverse."  Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1234 (11th Cir. 2006), quoting Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998).  To the extent that she asserts that Files' demeanor changed after the complaint was filed, all of the evidence indicates that Files

simply became "all business," and "strictly professional," conduct that any employer would desire and that Title VII is constructed to promote.

While she argues that other officers performed improper counts and were not disciplined, she admits that she had miscounted before and since, without being disciplined, and that there is a difference in a formal count and an informal count. None of the disciplinary actions about which she complains has resulted in any change in her employment, position, or pay. None of the discipline, except the verbal counseling, was imposed by Files, or was shown to be related in any way to her complaint. Moreover, none of the actions she asserts were retaliatory would dissuade a reasonable person from pursuing a claim. Accordingly, these allegations do not rise to the level of an "adverse employment action."

There is no dispute that Stevens engaged in protected activities by complaining of Files' statement, by seeking redress with the EEOC, and by filing this lawsuit. What she has failed to show is any employment action that was sufficiently adverse to set forth a viable claim. Additionally, she has failed to offer any evidence that the "retaliatory act" was related to her complaint. She bears the burden of proving a causal link between her protected activities and the alleged retaliation, and while this is not a heavy burden, it must be based on more than mere speculation. Except for two disciplinary infractions in April and July 2011, for which there is no evidence that either involved Files, the other alleged instances

of retaliation occurred many months later, in January 2012 (reduced discipline for Inmate Vernon Whitlock) and June 2012 (alleged denial of transfer).  On April 1, 2011, Sgt. Jones gave plaintiff a "counseling session" related to an inmate miscount.  Although plaintiff's affidavit states that Sgt. Jones was instructed to do so by Files, there simply is no evidence of it.  The counseling form (Plaintiff's Ex. U) is signed by Sgt. Jones and recites that she is the officer who received the miscount by plaintiff.  In July 2011, Warden Danford recommended a two-day suspension of the plaintiff for failing to write a report of inmate misconduct before leaving at the end of her shift.  That recommendation was reduced to a reprimand by Commissioner Thomas.  Plaintiff does not dispute that she failed to write the report, and there is no evidence from which a reasonable jury could infer that the recommendation or the reprimand were in reprisal for plaintiff's February complaint against Files.

In sum, plaintiff has provided insufficient evidence from which a jury could infer that the defendant's articulated reasons for the imposition of discipline or denial of a transfer request is not worthy of credence and that the real reasons were retaliation.  For this reason, defendant's motion for summary judgment on the retaliation claim is due to be granted.

## C.  CLAIMS ARISING UNDER § 1983

The plaintiff asserts that the discriminatory and retaliatory acts she alleges in her Title VII claims also constitute acts by the defendants, acting under color of state law, to deprive her of her constitutional rights.   (Complaint, doc. 1, ¶¶ 47-55).  She asserts in her brief that Files engaged in bad faith, willful and malicious acts, and that defendants Danford, Culliver, and DeLoach acted in bad faith by "refusing to investigate and assist Plaintiff" to obtain relief from sexual harassment retaliation, and that Thomas, through "deliberate indifference," failed to stop the gender discrimination" that she alleges occurred.  (Doc.1, ¶¶ 61-71).[18]

Defendants seek dismissal of the claim, and argue that §1983 is inapplicable, as an equal protection claim, because the plaintiff has failed to show even the elements of a discrimination claim.[19]   Plaintiff addresses this claim in her opposition to the motion for summary judgment by attempting to raise issues

---

[18]   Counts Three and Five of the Complaint state two different 1983 claims. Count Three does not specify what constitutional right was infringed except that there were "acts of discrimination."   Count Five alleges more specifically that defendant Thomas had notice of the discipline given to plaintiff by Danford, and "failed or refused to stop the gender discrimination that plaintiff suffered."   While the court is somewhat baffled by the precise theories of recovery presented here, both § 1983 claims clearly rest upon the premise that Stevens was subjected to discrimination on account of her gender or sexual orientation.  The court, however, already has determined that these claims are without merit to warrant redress under Title VII – even if Title VII included protection for homosexuals as a suspect class.

[19]   The Complaint makes no mention of any due process violation.

regarding allegations of improper conduct by prison authorities toward female inmates at Julia Tutwiler Prison for Women.   (Doc. 33, pp. 63-70).   The court refuses to take the giant leap urged by plaintiff – that allegations that prison officials behaved horrendously against female inmates in one institution indicates that other prison officials at another institution deprived this female employee of some constitutional right that has never been articulated.

To the extent that the plaintiff seeks redress under § 1983 for gender discrimination, the claims are analyzed under the same McDonnell-Douglas framework employed *supra*, and thus, for the reasons already discussed above, she is not entitled to any relief.   To the extent that the plaintiff is asserting a relatively novel claim that she was discriminated against on the basis of a *mistaken perception* of her sexual orientation (she was believed to be homosexual when, in fact, she is not), she has failed to demonstrate that the single instance of name-calling violated the Equal Protection Clause of the Fourteenth Amendment.[20]

_____

[20]   While an Equal Protection Clause argument has been successful in a sexual orientation case where the plaintiff had been fired because of her "gender non-conformity," the loss of employment was the type of economic damage that could support a Section 1983 claim.   See, *e.g.*, Glenn v. Brumby, 663 F.3d 1312 (11th Cir. 2011)(finding a state employer liable where an employee, biologically a male, was fired based on his Gender Indentification Disorder and the treatment, which involved presenting himself as a woman).   Brumby, however, dealt with a plaintiff whose appearance and demeanor created an obvious gender non-conformity, and is nothing like the case here where Stevens asserts that she is not homosexual, and where there are no allegations that she presented herself as a male.   Calling an employee a derogatory term that refers to a homosexual is not, in

Accordingly, the defendant's motion for summary judgment on Counts Three and Five also is due to be granted.


**D. State-Law Claim**

Plaintiff also asserts that  Files invaded her privacy in violation of Alabama law.  Because all federal claims in this case are due to be dismissed, the court finds that the remaining state-law claim is due to be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).  The court of appeals has expressed the view that, when all federal claims are dismissed prior to trial, the district ordinarily should decline supplemental jurisdiction over state-law claims.   See Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th Cir.2004) ("We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial."); Clark Memorials of Alabama Inc. v. SCI Alabama Funeral Servs. LLC, 991 F. Supp. 2d 1151, 1169 (N.D. Ala. 2014). Accordingly, the court declines to exercise jurisdiction over any state-law claim, and the plaintiff may reassert that claim in state court.

---

itself, actionable under either Title VII or § 1983.   See   Equal Employment Opportunity Comm'n v. McPherson Cos., Inc., 914 F. Supp. 2d 1234, 1243 (N.D. Ala. 2012).

## **CONCLUSION**

For all of the foregoing reasons, the defendants' motion for summary judgment is due to be granted and all of plaintiff's federal claims are due to be dismissed with prejudice. The remaining state claim for invasion of privacy will be dismissed without prejudice. A separate order will be entered in accordance with the findings set forth herein.

DATED the 18th day of March, 2015.

_____
T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE